Good morning, ladies and gentlemen. We'll start with Smith v. Ill. Dept. of Natural Resources. Please proceed. Good morning, Your Honors. May it please the Court. Vito Mastrangelo, on behalf of the plaintiff's appellate, with the Court's permission, we're going to split our argument time. That's fine. And you keep track of the time however you want to split it. Yeah, I've got my timer set up here. Okay. Your Honors, the case before you, this appeal, is relatively straightforward. The question is whether the Dept. of Natural Resources can violate Illinois statutory rulemaking requirements with impunity. The good news is we don't have to have a debate about fracking here. Well, I think we do, because I don't exactly understand horizontal fracking. Okay. Now, I assume that you're going vertical. How far? Well, a mile or more. That's traditional. Yeah, a mile or more. In Illinois, aren't you past anything? You're usually by 4,000 feet max. 4,500? I think that's the usual, Your Honors. So then you're going to – what are you looking for? The OVAW sand? What do you have? I don't – the new opening shale is what we thought – Well, I thought that was only in Texas. You got shale up here? Yes. This is shale. Oil from shale. It's not the OVAW? What is it called? It's not what? What is it called? What's the zone? Well, it's the Illinois Basin, but it's – the new opening shale was what – is where they made most of the oil. So that's probably in a sandstone or in a limestone? I don't know. It's shale, so I – It's shale. It's probably sandstone, I'm guessing. I think it's a layer next to the sandstone. Okay. Absolutely. So what I can't figure out is when do you start making your turn going down? About 3,000 feet? 2,000? That depends on where you're going. So it would be different depending on where the vertical wells are going down. So on a – my question is, how do you know where you're going? Well, they have the vertical wells now. Right. They know what strata of oil – Right. About 4,000 – Yeah. I think that's typical, but I think it differs from northern parts of the basin to the southern – you know, to different parts of the basin. I think it differs at the level. But I thought generally speaking that Illinois Basin's about – max about 4,000, 4,500 feet for the – I believe the test well has been drilled a mile deep in Illinois. That's 5,280. That would be awfully deep. We know that fracking in other states goes a mile deep. Yeah, all right. And then the horizontal leg will go a mile or two miles horizontally. Now, I just saw the results of a test well where they went down and they knew where to turn, and then they had reports back at every state. I think they go down and they examine the results, and then they go down again. Well, you can use electric and figure out what the resistance is, I guess. I don't know how they do that. Well, they make the turn. What I don't understand is I guess you're talking about perforating into another zone or into the water zone. What's the problem? Well, first of all, the way it's done is use explosive charges to create fractures in the shell. But you've got to drill the well first. Right. Yes, that's correct. Okay. And then you don't go in and perforate until you get your casing in there, do you? Or do you not case in the zone that you're going to horizontally drill? I don't understand that. Well, the casing, I believe, is at the vertical end of the well to prevent fluids from coming back up. Well, but you case it, but then you've got to cement it, right? That's the end. At the end, yes. You do that before you perforate it. So what you're going to do is, my understanding, and I might be wrong, that you drill the hole and then you've got the casing. And you put the casing in. Well, you've got to have the shoe on the bottom of the casing. Now, do you even have a shoe on the – because you've got no casing in – I don't understand. Do you have the casing in the horizontal? I don't know. Okay. I don't think so. I know a vertical well, but I don't understand the horizontal. So you go down. You've got a shoe on the bottom of your tubing. And so before you perforate, which you say is explosions, you pump cement down the casing. I don't think the cement goes down that far, John. And you put the casing all – and then the cement comes up the sides of the casing and seals the well. That's at the end. And you've got the volume of – you know the volume of your tubing. So then you put water, the volume of the tubing. So when you push it down, you've got the water goes to the shoe and it goes up the sides. But the water – you only put enough water in to fill the casing. That's vertical drilling. Right. Right. That's where we're stuck. Okay. The new statute is a completely different process. The new statute is only for high-volume, horizontal drilling. By definition, the statute says it needs to be – I think it's 80,000 gallons of – I'm sorry, 800,000. The statute was designed to regulate only high-volume fracking, which what we were hearing, what the legislature was hearing, was a million or two million gallons of food. So they're not concerned with traditional fracking, neither vertical nor a horizontal well that doesn't involve a lot of fluid. Now, fluid, what do you mean by fluid? You mean oil or water or what? No, the fluid that they use to frack with. Okay. And what is that exactly? They won't tell us exactly. Well, my understanding of fracking is that you have a mixer truck with your fracking machine. Is that correct? I don't know. I know that there are – it's water. And sand. Mostly water, 99% water and sand. And some kind of a chemical that makes it turn into a gel. The chemicals serve different purposes, some of it for flowing, some of it for smoothing things out, some of it for friction. When you pump the material down and it goes out, and apparently you say explosions. Well, I don't think it – I think that's – you're talking about perforating. Yes. But you would not do that if you don't have any casing. Well, the metal casing is down there. That's the hole that – But does the metal casing, does it make the turn? Yes. So then there's casing that's horizontal. And there's holes in the casing. Well, there's no holes in the casing until you perforate it. Well – And you don't perforate it until you're finishing the well. Yeah, I don't know if that's correct. I think perforation refers to the hole. Okay, now here's my problem. Okay. So you're going to go in there and frack. So you've got a zone. What's your zone? About 10 feet in Illinois. They're not very big, are they? 10 feet? I don't know what they are in Texas. Oh, I don't know. But I mean the depth of your zone. So you're down there, and you made your turn, and you're in the middle – let's assume you did a good job and you're in the middle of the zone. So then you go out horizontal so far. Now, you say there's casing in there. If there is, nothing's going to run because it can't get into the – through the casing. So you've got to perforate. Right. So when you perforate, then aren't you going to push – blow holes in the casing? They do that intentionally. Yes. Right. At strategic spots in the casing. Right. Okay. But if you go too far, you're going to get into water, aren't you? They're just trying to avoid that. Oh, yeah. If you do that, then you've got what? Squeeze the well? Right. That's when you're going to pump cement down in there to fill what you did too much. Right. Okay. But if – so if you get into the water, you made a mistake. So you've got to squeeze it. So you've got to pump cement in there and then do it again some way. But if the zones – and the water that you're getting at, say, 5,000 feet, 4,000, wherever you're at – I don't know where you are. It's saltwater, right? So it's not drinking water. Well, there are underground waters. But see that water underground is saltwater. Now, the water that's going to be 200 feet, 150 feet, whatever they do, I don't know what it is. That's drinking water. So what you're trying to say is that fracking, you're opening up a zone. And you all know I don't think they're very big. So if you open up the zone and you get in the water, you've got to squeeze it. I'm having trouble understanding what the problem would be that deep in the ground. Well, this case doesn't involve that problem. I mean, we are here only complaining about the way the department drafted the rules and implemented the rules. The statute was very detailed. The department didn't have a lot to do because the statute put a lot of details – the legislature put a lot of details in the statute. The wisdom of how they regulate for a high-volume fracking, that's the debate that I'm not here to have. I can't tell you anything about it right now except challenges. Okay. Go ahead. I have a question, counsel. On the court below, wasn't it a denial of preliminary injunction? Yes, sir. And you're arguing a de novo review? Yes, sir. Would you explain to me how you're – and the basis for your de novo review argument? Certainly. Your Honor, the status of the case in the trial court is we have filed our complaint. And with the complaint, we filed a motion for preliminary injunction. Those were the only pleadings we filed. Excuse me. And the Attorney General's Office filed an objection to the motion for preliminary injunction. So there's been no answer. There's been no discovery. There's been no other pleadings. At the hearing on the motion for preliminary injunction, we have with us some affidavits from plaintiffs to support some of our allegations. And at DNR's behest, the circuit court said the court was not taking any evidence. So no witnesses, no testimony, not even any affidavits. So all the trial court had was the complaint, the motion, and the objection. Now, Your Honor, that's when you have that before you. We have exactly the same things before you that the trial court had. So that's one level of why de novo review is appropriate. And our brief includes many cases, including from the Supreme Court, that say where the reviewing court has before it the identical information that the trial court has. There's no reason to defer to the trial court. And the second level for de novo review would be all these questions are questions of law. Because there has been no factual dispute, no evidence, no testimony, no witnesses. These are all questions of law. And the reviewing courts many times, including cases in the Supreme Court, has said that where you have questions of law, the review is to go. And so that's what we're talking about here. Does the complaint on its face state a cause of action? And if so, are there requirements for a preliminary injunction? Have they been met? And because the court did not take any evidence at all, refused our offer to submit evidence even, this court has before it the very same information as the Supreme Court. And therefore, the reasons for deferential standards of review do not exist in this case. Normally, your honors would defer to the trial court because he or she saw, the trial judge saw the witnesses testify. Or there might have been some demonstrative evidence. But there was no evidence in this case. Just those pleadings, the complaint, the motion, and the injunction. So that's why we believe de novo review is required in this case. Does that answer your question? Well, I'd like to hear from the other side, too, when they have the chance. Well, as I said, your honors, really, this is bringing our focus up here. We're all talking about whether a DNR violated the statute. The statute we're talking about is the Administrative Procedures Act. And that act was adopted to give the public the right to participate in rulemaking. And in our complaint, we set out various instances where we claimed that the DNR did not follow the sections in that statute. There is a dispute about whether, what the result of violations would be. The department claims that there's one section from 1991 to 1992 that says that there's only limited, there are only a few violations that would result in the invalidation of the rulemaking. But then in 2009, a new statute was passed. And it's very clear, it's quoted in the back of our brief on page 34. Section 5-6 of the Administrative Procedures Act says, all rulemaking authority exercised on or after this effective date, 2009, is conditioned on the rules being adopted in accordance with all the provisions of this act, the Administrative Procedures Act. Any purported rule not so adopted for whatever reason is unauthorized. So a violation of the rules in the, the requirements in the Administrative Procedures Act means that the rulemaking is invalid. And we have several, in our complaint, we have several accounts that describe violations of the Administrative Procedures. Things like, and we don't have time, there's nine counts, I don't have time to get into them all. But just for an example, the Administrative Procedures Act says, at least one agency representative, DNR representative, shall be present during the hearing who is qualified to respond to general questions from the public regarding the agency's proposal and the rulemaking process. Well, there were agency representatives there, but at each hearing, the hearing officer said, this is not a question and answer session. So there was a DNR official there, but they refused to take any questions. It's, it's in direct conflict with what the statute says. There has to be an official there to answer, to be able to answer questions of the public. And DNR tries to justify that by saying, well, there are a lot of people there, and we're allowed to adopt rules for the hearings, but they can't do anything that's, they're not allowed to do anything that's contrary to what the statute requires. So that's one example of how the plaintiffs are six individuals, five of whom are landowners in southern Illinois, who either participated in the rulemaking process or tried to and were denied in some respect. One plaintiff was prohibited from getting in to one of the hearings. Apparently there was a space problem. Another one was denied the opportunity to speak. He was on a list, and it appeared there was time for him to speak. They refused to allow him to speak. So that's what resulted in a complaint about the way that the rules were adopted. We are, I'm already past my 10 minutes, so I want to just make sure I covered anything else that I wanted to mention to the Court, and I'm going to turn it over to the Co-Counsel. Well, yes, irreparable harm. I'm going to turn it over to Penny because she's going to talk about irreparable harm, but I wanted to explain something that both DNR and the Circuit Court, I think, failed to grasp from our complaint. We are arguing that the harm itself is the failure of DNR to follow the rulemaking requirements, depriving us and other members of the public of the opportunity given by statute to participate. DNR seems to, and the Circuit Court also, seem to think we had to show some harm from the fracking process, and that we shouldn't have to show that, Judge. I mean, that's down the road if a permit is granted, if regulations are used. The harm we're trying to show the Court here is that we were deprived of rights under the Administrative Procedures Act. That's the harm that we're complaining about. If you have any questions, let me know, but I'll turn it over to Penny. Well, I was assigned irreparable harm this morning, Your Honors, because, as you've seen me many times, I'm kind of the injunctive relief person when it comes to environmental issues in Southern Illinois, and so the irreparable harm issue is very personal to me. I'll tell you, the first case law I read on this subject was by the esteemed Justice Rarick, who wrote a simple two-, three-page decision called People v. Mica Timber. I used it in every pleading when I was a government lawyer. It says you have a violation of the Environmental Protection Act, and the statute says that you're authorized for injunctive relief. By that, you show the violation, you get your injunctive relief. All the traditional elements go away. We have the same exact situation here, where the government has held the standards for their rulemaking. It says how many days' notice for the hearings. It says you're supposed to identify studies. It says you're supposed to have somebody qualified to answer questions of the public. They did not follow these things. We've documented it thoroughly. You can see in the record from the transcripts, no, we're not answering questions. No, we're not giving you an agenda. No, we're not going to tell you about our studies. And then in second notice, we're going to tell you about 200 studies that we looked at. So they did not follow the rules, and the statute that authorizes the rules, that tells you what the rules are, says that you have two years to sue to say the rules are invalid. We sued before the rules were published so that we could say, don't publish these rules because you didn't follow the rules when you adopted them. What's the remedy for that? Well, the remedy is presumed that rules are invalid. What do you do? Well, you don't have the rules be valid. So what is that? It's injunctive relief, and it's presumed in the law. And so I think that the judge's decision is actually very well-reasoned, but she gets to the conclusion, she says, well, you didn't show that you have irreparable harm to you people. Well, our irreparable harm is our government didn't follow the rules that our government came up with for us to participate so that we could have good government decision-making. That's our irreparable harm. Is our irreparable harm distinct from other citizens in Illinois? Well, it probably isn't because all citizens in Illinois have a right to participate in their government and to hold their government accountable for the rules that our government has come up with, that the government has to follow those rules just like we have to follow those rules. We file our notice of appeal two days late, too bad. That's the way it is. Same thing applies here. The case law says that. The statute itself talks about the remedy. So if the rules are invalid, then you give us an injunction and you deem the rules invalid. Thank you. Counsel, you'll have some additional time on rebuttals. Thank you. Mr. Laitner? Yes, Your Honor. Good morning, Your Honors. May it please the Court. Brett Laitner. I'm the Deputy Solicitor General for Illinois and I represent the appellees in this case. Your Honors, this Court should affirm the interlocutory decision of the Circuit Court because its decision to deny plaintiffs' motion for a preliminary injunction was not in the views of that Court's substantial discretion. Turning first to a question from Your Honor earlier, counsel, regarding the standard of review, plaintiffs have a fundamental misapprehension of the preliminary injunction standard. While it is true that sometimes questions of law are presented within the determination of prison, meaning the elements of a preliminary injunction, the Court's weighing and determination of whether the preliminary injunction elements overall are met is an exercise of that Court's equitable power that has long been recognized undisputedly as within that Court's discretion. Whether the plaintiffs have met the adequate standard, have shown sufficient irreparable harm, is a discretionary call by the Court. Whether there is a fair chance of a likelihood of a successful marriage is a discretionary call. Whether these elements justify the extraordinary, equitable interlocutory injunctive relief is discretionary. It is not an answer to simply say, well, this Court has before it the same information that the Circuit Court does. That's always true on appeal. You have the record on appeal. It is true when you have circumstances where you're analyzing the credibility of witnesses. The Circuit Court is uniquely suited to examining those. And that's why this Court reviews those determinations for under the Memphis What If The Evidence standard. But regardless of how the subsidiary questions are answered, the overall question of whether the equitable factors for an interlocutory injunction element is a matter of the Circuit Court's discretion. Turning to those first principles, to be entitled to a preliminary injunction, the plaintiffs must meet every element, a clearly ascertainable right in need of protection, a lack of adequate remedy of law, their imminent and irreparable injury in the absence of an injunction, and a likelihood of success in the marriage. The courts have explained that this is an extraordinary remedy. And today, plaintiffs continue to ask for something even more extraordinary, for something that's already extraordinary. They ask for a preliminary injunction to enjoin the enforcement of administrative regulations when they can say no court, no Illinois decision that has ever done that. And there are reasons. Because it's not proper. A preliminary injunction on a preliminary injunction to enjoin regulations is not the case if regulations ultimately on the merits are shown to be invalid. They are invalidated. You can't enforce them. No question. But a preliminary injunction standard is not proper. And there are certain reasons for this. At the outset, plaintiff's claim is doomed because they fail to show a fair question about likelihood of success on the merit of their claims. Simply, under Supreme Court Rule 341H7, they've waived that argument. In the appellee's brief, the department goes through in great detail all nine of the counts of their complaint and explains why they do not have a likelihood of success on the merits. The answer in the reply brief on page 11, we stand on our opening brief. Their opening brief, one sentence says, well, the circuit court found that there's a likelihood of success. That is inadequate to preserve the issue and to show a likelihood of success. Furthermore, the circuit court did not undertake any detailed explanation of the likelihood of success on the merits of fraud. The circuit court looked at two things, a total of two things in this decision. First, it looked at their argument that they were denied a meaningful opportunity to participate in a hearing. And the court simply said, page 143 of the record, the court is unable to determine whether E&R allowed meaningful participation. End of story. No meaningful analysis of anything beyond that. Then at page C44, C44 of the record, the court looked at the department's statement that it did not use studies in preparing its first version of the rules. And the court simply said, I can't tell at this point whether answering no to that is a violation of the APA. I'll allow discovery. That is the extent of any of this meaningful discussion of a likelihood of success on the merits. While that's certainly way more than the plaintiffs have offered in their briefing, it still is inadequate to preserve the issue. Their claim is forfeited under Supreme Court Rule 341H7. The advocates in their brief explain why there is no likelihood of success on the merits. They can't simply say, oh, well, the circuit court found it with no further explanation, especially when the circuit court offered no meaningful explanation. So at the outset, they failed. Turning to irreparable injury. While counsel argues from her past that the court has said when there's a violation of the Environmental Protection Act and that statute says you can get an injunction, then you can get an injunction without showing irreparable injury. And that's true. And that's very distinguishable from this case because, one, that statute says the government can get an injunction to enjoin the violation of the act. When the general assembly specifically says that you can enjoin violation of this act, that does away with the traditional elements for an injunction, for a preliminary injunction. That's not in the EAPA, the Administrative Procedures Act. Nowhere says you can get an injunction to enjoin violation of this act. Nowhere says you can get a preliminary injunction to enjoin violation of this act. The statute, as distinctly opposite to the Environmental Protection Act, does not state that you can do away with the traditional elements for a preliminary injunction. If we read, there is no presumed harm under the APA. As the Sherman case that the department discusses in the AFL-E specifically makes clear, the presumed harm doctrine applies for government seeking to enjoin violations of a statute where the statute specifically allows it. Plaintiffs are neither the government nor are they suing under a statute that specifically allows or finds a presumed harm to statutory violation. Furthermore, plaintiffs have offered nothing more than speculation of any harms, of any actual harm. And a preliminary injunction will not be granted to allay unfounded fears or apprehensions. The Smith Oil case that we quoted in our brief says that. Again, there's no presumed or irreparable harm in this situation because the statute is different than, for instance, the Environmental Protection Act. And the Sherman case specifically outlines the doctrines of that and talks about a government suit. Moreover, the plaintiffs are running headlong into serious standing requirements. It's a basic element of standing judiciability that plaintiffs must allege something more than generalized grievances. They must allege some kind of specific harm to them. But they have done no such thing. They have done no such thing in this case. Simply stating a societal interest in making sure the ADA is followed does not justify a preliminary injunction, does not justify the extraordinary relief of a preliminary injunction. Setting aside standing, setting aside whether ultimately they may prevail, and ultimately they may be able to rejoin the state. But that's a different remedy. Counsel, I got the idea from your brief that, or let me put it this way. Is there a chance that one of these plaintiffs at some point in time could seek a preliminary injunction when someone actually got a fracking permit and started to frack, and then they could ask for temporary relief to halt that because the regulations are invalid? If the harm becomes imminent and they can show that because of these invalid regulations, something bad is going to happen to their land or to some sort of property interest, then they could. Certainly there are situations in which plaintiffs may claim, may think that they face an immediate harm from a hydraulic fracturing activity, and they could come in and claim that. But they're also going to have to actually tie some kind of harm to some problem with the regulations. Not the fact that the regulations were invalid necessarily, but that the regulations aren't protecting their interest. These are the regulations, double-sided. These are very detailed regulations. These regulations, for instance, that I just heard, and the in-depth discussion of the surface casing and the cementing and all the other things that your Honor is going to recall to me about in terms of the actual engineering for the hydraulic fracturing process is detailed very specifically in these regulations designed to protect groundwater, designed to avoid seismic activity, improper seismic activity. But, you know, so the short answer after that long-winded detour to your question is, yes, there is a circumstance in which there could be, I can envision a circumstance in which it could be imminent enough and real enough for a plaintiff to bring suit, saying that I'm going to be harmed. These regulations do not prevent that harm. Give me a preliminary judgment. Counsel, I wanted to ask you another question before you run out of time. You'd made a moodless argument in your brief that the relief they specifically asked for in their motion for a preliminary injunction was the adoption, filing, and publishing of the regs. That's already been done. The Secretary of State has already published them. And I think they're in the reply brief. They said, well, and we ask more generally for such further relief as the court deems just. And that saves us. Your Honor, our argument is that that is inadequate to save them. Inadequate? Inadequate. It is not adequate to save them. A preliminary injunction needs to be for notice, due process requirements, and just by the mere fact of the nature of this remedy, needs to specifically say what we want to prevent. It needs to tell the court specifically what actions are intended, and why the court, in its preliminary injunction orders, must be very specific as to what is enjoined or not enjoined. Some kind of catch-all phrase is not adequate to preserve that type of relief. Turning then for a few minutes to the likelihood of success, actually the specific claims that they seek to base their injunction on. The first claim is that the Department failed to publish in the regulatory agenda that it was going to issue regulations. First of all, that is under Section 5-60 of the APA, which is not a basis for invalidation of the rules. Section 5-35 of the APA specifically says that rules not passed in conformity with Sections 5-40, 45, and 50 are invalid. Section 5-35 specifically says if you violate these provisions of the APA, then the regulations are invalid. 5-60 is not one of those. The Vega case, the Vega case, the Electoral Court case, says that substantial compliance otherwise with the rules is satisfactory. They, plaintiffs, rely on Section 5-6, which says that action is not authorized unless it is in compliance with the APA and the JCAR proceedings, the Joint Committee on Administrative Rules. The legislative history behind the enactment of that in 2009 is clear. There was a fight going on between the executive branch and the legislative branch as to whether the JCAR rules were advisory or not. The government at that point had filed suit claiming that JCAR was just advisory and could not actually hold up administrative regulations. That is why 5-6 was enacted, to make clear that you still had to go through JCAR. But reading 5-6 as plaintiffs would, that would make 5-35 superfluous. Section 5-35 specifically says these are the provisions you must comply with, otherwise the rules are not valid. That is the mandatory as opposed to permissive sections of the APA. In any regard, 5-60 only provides that you should publish notice of rulemaking, anticipated rulemaking, in the Illinois Register in either the January or July issues. It specifically says that a department still has the authority to publish regulations, to enact the regulations, even if they don't publish it in the regulatory agenda. The rule specifically states that failure to publish a regulatory agenda does not preclude the power to enact regulations. Furthermore, while it is true that the department stated in their first notice that they did not publish the anticipated rulemaking in the regulatory agenda, they in fact did. In July 1, 2013, Volume 37 of the Illinois Register, Issue 29, on page 11725, they said the department reported anticipated rulemaking, regulations under the Hydraulic Fracture Act. Insofar as it harmed plaintiffs' reclaiming, they didn't know that these rules were going to be coming down the pipe. They knew, as of July 1, 2013, in that issue, Volume 37, Issue 29 of the Illinois Register, that these regulations were going to be coming. They claimed violations under Section 5-40 that they received insufficient notice of the hearing, but the department held five public hearings and received thousands of written comments. The department gave more than 20 days' notice of the three hearings that were not specified in the first notice. That's all the statute requires. Section 5-40 says that a public hearing in response to a request for a hearing may not be held less than 20 days after the publication of the notice of the proposed rulemaking. The proposed rulemaking notice was on November 15th, and the three extra hearings, December 16th, 17th, and 19th, in Effingham, Decatur, and Carpenter, more than the required 20 days' notice as required by the statute. Claims also claim that the department failed to make an agency officer available to answer questions. But Section 5-40b only requires one agency representative to be present during the hearing who is qualified to respond to general questions. The statute does not state that the agency official must answer questions. It does not state that the agency official must engage in a dialogue with people who are making comments. This specifically needs to be read together with a previous sentence of Section 5-40, which provides that the department and agency shall issue reasonable rating rules for the conduct of the hearing. Did the agency respond either in writing or orally at the hearings to the numerous written comments, and I assume questions that were put to them? Yes. The department's response is hundreds of pages long, and they responded in writing to the comments. And how was that published? That is publicly available at the very least on the department's website. Whether it's in the Illinois Register, I'm not sure. I do actually have the answer to that. I can give that if you would like me to submit a supplemental brief on that. But the department's comment to all the comments is publicly available, was published. Now, so reasonableness is the guiding principle for the conduct of these public meetings. That word, reasonableness, is not creation by the department. That's from the actual statutory provision. The department realized there was a lot of public interest in this. They held five hearings. They took thousands of written comments, and they issued hundreds of pages of response. In fact, the process worked because the second set of rules, the rules that went to Jay Carter, the second notice period, is substantially different than the first notice provision. The department heard the comments, and they responded, and they changed the regulations. The process worked. Claiming simply that one person was not allowed to talk at one meeting does not show that it was unreasonable. The hearings were unreasonably hellerconic. Or admitting that some citizens were turned away from the Chicago meeting does not show it was unreasonable. It doesn't have to be perfect. There's nothing in the statute that says that the department must allow everybody to speak who would want to speak. In fact, the statute specifically says that the department can enact rules to prevent cumulative and repetitive statements. The department does not have to say it and listen to everybody come up and say the same thing over and over again. That requirement simply does not exist in the statute. Finally, I would add that the department answered no, that it did not use any studies to begin with, but that during the first notice period and looking at the comments, they decided they did need to look at studies. Initially, they were simply using mostly the regulations that had already been issued for other oil and gas operations. They said, okay, this is a different situation, and why do these comments? And the department turned to over 200 studies. They issued a 23-page bibliography of the 200 sources. They made a good faith effort. They said, no, we did not use any studies in the preparation of the first rules, and then in response to the comments, because they were listening to the comments, they turned to over 200 sources and published that bibliography. Additionally, the department has no duty to publish the transcripts of the hearing. The statute, section 5-40, provides only that. The hearings must be stenographically recorded or electronically recorded. There is nothing in it that requires publication of the transcript at any particular time. Tenors claim that it is a violation of spirituality, but there are no spiritual violations of the statute. Thank you, counsel. Thank you. Well, if anything, we're pulling back. And I will say that the fact that they had never read a single study when they proposed these rules, then when they go to second notice and the public can't comment on what they're proposing, they have 200 studies that they now identify with the rest of the public, but the rest of the public can't comment on those studies. Wow, if there's 200 studies, how come you didn't read even one study before you proposed these rules? They should have went back to first notice and allowed the public to participate. You know, when they tell us that, you know, all you have to do is have somebody qualify, but you don't really have to have them answer any questions. Wow, I'm going to go with there is no spirit here that we're following. I'm going to read it to you exactly. It says, this is 5-40-B, it says, at least one agency representative shall be present during the hearing who is qualified to respond to general questions from the public regarding the agency's proposal and the rulemaking process. We have cited all four hearings, the transcripts where they say we're not taking questions, we're not answering questions. Yeah, we've got qualified people here. I guess we don't, because you know why we don't? Because they didn't even read a single study, so I guess they can't really tell the public anything about what they're doing. You asked questions about fracking. They never even heard of horizontal fracking before this all came up. We want to pass these records. We want to get them through. We want to get them through fast. Well, while they were getting them through fast, they played roughshod over the law, and the government doesn't get to play roughshod over the law. That law says you have to follow all of the requirements of this law or the rules are invalid. They did not have qualified individuals to answer questions of the public. They did not properly notice at their hearings. We list all the things that they didn't do. The judge in the trial court wrote a reasoned opinion, and in her reasoned opinion, she found, of course, we had standings. She found these things. So, of course, we're standing on our arguments. It doesn't mean we forfeit what we already won. What she said was, you didn't show me that you had irreparable harm. You didn't show me that you're going to be harmed by this. And what we're saying is, well, when the government doesn't follow the statute that tells them how to propose rules and they don't do it right, just like if we didn't do it right in this court, they got to go back and they got to do it over. Us, we're just kind of out of luck. But they need to go back and do this right. They need to follow the rules. So however fracking works or whatever issues there are out there about radioactive salt water that they hit that might be released back to the surface, or whether they're re-injecting and we trigger the wall bash or the pneumatron that our, you know, modeling says should have blew already, that's all irrelevant to this proceeding because we don't have to show that the pneumatron is going to blow if you re-inject. We don't have to show that as our irreparable harm. Our irreparable harm is in fact presumed, whether we're enforcing the law or not, how handy that the government gets a presumption that they don't have to show the traditional elements of adjunctive relief, but we don't even get a presumption of irreparable harm. And we're proving the traditional elements. We proved the standing. We proved, you know, that we had no adequate remedy at law. And here's the thing. What is the use of the statute if the statute says you follow all these rules or it's invalid, but, and we give you two years to challenge it, but if you challenge it, you know, you've got to prove that the pneumatron is going to blow when they drill. No, that's not what it says. It says government, you're accountable like everybody else to follow the rules. And the government came up with the rules, and the government clipped participation from the public, and the fact that they have all these comments, the fact that they have all these studies now tells you nobody's ever challenged this before. That's because this is so significant that people go out of their way to represent other people for free, come here to tell you please make them follow the rules because we really do need to be protected from this. We really do need to study it. We really do need to think about what we're doing before we do it. And all we're saying is since you didn't follow the law, since you totally ignored your own statute in passing this, you should have to go back and do it again. Maybe then we won't have a traffic light system for when we can blow our magic fault line. So I would say the irreparable harm is definitely presumed in the law, and we've shown that there will be irreparably harm because we know from the news media and the public and all of the articles of what's happening with fracking that there is, in fact, contamination of groundwater. In Illinois, our shale's different. Our shale's not like the shale in Pennsylvania or the shale in Wyoming. Our shale is different, and it fractures different. And when it fractures, we don't know how to handle the escaped gas and deal with that in these regulations. Not that that's the subject today, but we need to be safe in what we do, and we need to protect our public. And just because we're southern Illinois and we're a bunch of yahoos way in the middle of nowhere doesn't mean that the government can just do whatever they want with their regulations and think that we're not going to pay attention if we're paying attention. Thank you. Counsel, thank you for your arguments and your well-written briefs, and we will take this matter under advisory. Thank you.